Mr. Harrington, when you're prepared, please proceed. Darin Harrington May it please the Court, my name is Darin Harrington and I am the legal representative May it please the Court, my name is Darin Harrington and I represent the petitioner, Jacobs Field Services, North America, commonly referred to as Jacobs. In the case before the Court today, the issue is whether or not Jacobs complied with an OSHA standard that requires the employer to assess hazards associated with work that it tasks its employee with performing to determine what type of electrical protective equipment the employee should wear. Jacobs complied with this standard. All the fact witnesses agree that had the employee in this case stayed within the scope of his work, he would not have been injured by an arc flash. The Administrator Does it matter that the company had a policy in effect that allowed or at least made it understandable that the employee could remove the personal protective equipment while performing aspects of the work? Darin Harrington It matters in the sense that it demonstrates the diligence of Jacobs in assessing the hazards. The Administrator Not this hazard. Darin Harrington Your Honor, this hazard The Administrator Not this bad luck. Darin Harrington Your Honor, in this case, the hazard was a result of the employee going outside the scope of the work he was assigned to perform. Justice Breyer I don't say that in the scope of the work. It's permeating in your brief, and I don't see it at all. I think that's an invention after the fact to blame the employee. He had to get to the ground bar. The ground bar was behind the load half of the ABC load side, and there was a gap back there that this guy and his supervisor had not paid attention to. Darin Harrington Maybe it would be helpful to Justice Breyer And there was a live wire, neutral wire coming down from the line side, which they also hadn't paid attention to. Darin Harrington That's not correct, Your Honor. Justice Breyer That's the way I read the OSHA opinions. And looking at the pictures in the appendix, that's the way it looks. Darin Harrington Let me, Your Honor, just take a minute and review the underlying facts and the circumstances. This is a disconnect box. At the top of the box is what's considered the line side equipment. There are three phase wires that come in, and they connect to fuses. Or they would once this box was completed. Where that connection for those three phase wires coming in through the line side, those are energized. But in front of those connections is an arc shield put in place by GE designed to protect those little connections, those three connections, from any accidental contact. Justice Breyer And it was incomplete. Darin Harrington I'm sorry, Your Honor. Justice Breyer It had gaps. It had a gap behind and it had a gap on the left side. Well, the guard did not enclose those three. Darin Harrington The arc shield. Justice Breyer Yes, the arc shield. Darin Harrington The arc shield was not designed to be a perfect shield for this box. And tragically, Skye and his supervisor missed that. Justice Breyer They didn't miss it, Your Honor. This is a common practice. This is the industry practice. You do not have to de-energize those lines if there's an arc shield in front of them. Darin Harrington I don't care about it. I mean, the expert went through all that. It's industry practice for those muffins or whatever those things were that are not dispatch boxes that tend to be uniquely designed. Justice Breyer Well, I believe OSHA's expert, as well as the employers, as well as the three electricians testifying, all testified that it's common practice not to de-energize the line side if it's protected. Darin Harrington It wasn't protected. Justice Breyer Well, the arc shield, the standard for a guard is not, and this is very clear in OSHA jurisprudence, it does not have to make it impossible for somebody to reach around or behind to be properly guarded. It just has to make it not reasonably predictable. Darin Harrington But your policy shouldn't be, oh, you can take off your protective shield if you're reaching around with the top half of the box live. Justice Breyer There was no requirement for the employee to reach around behind that arc shield. Zero. Darin Harrington Then they have to attach the neutral ground to the bar? Justice Breyer Yes, Your Honor. That's at the bottom of the box. So all he's doing, Your Honor, all he's doing is taking three not energized phase lines and one neutral and attaching them to equipment at the bottom of the disconnect box. And that's it. None of that's connected to the energized stuff. There's a big space in between. Darin Harrington No, no, wait a minute. It's the ground coming down from the energized side that caused the arc flash. But that's not what he was tasked with connecting or working on. The problem is… Justice Breyer It's there. It's a hazard that's there. Darin Harrington But everybody testified, including the Secretary's expert, that had the employee not moved the ground bar… Justice Breyer But aren't some protections there to account for actions that may not be perfect or may not be the wisest choice at the moment? Darin Harrington They are, Your Honor. And that's what the arc shield is designed to guard against, accidental contact. Justice Breyer As well as the face shield and the gloves. Correct? Darin Harrington Well, once you've de-energized or verified that the bottom half is de-energized and this is behind an arc shield, all he's doing is screwing in three lines down here at the bottom. That's it. He's not supposed to move the ground bar. And the employee admitted that. He said that was wrong. Justice Breyer But he has to reestablish the ground. Darin Harrington No. He's not doing anything with that ground wire, Your Honor. That was not part of his task. He had a neutral that he's supposed to attach to the ground bar, and that ground bar also had a ground wire attached to it. Justice Breyer Yeah. That's the neutral I'm talking about. He had to reattach the neutral, the left-side neutral, to the ground bar. Darin Harrington To the ground bar, and that was it. He did not need to move the ground bar to perform that task. Justice Breyer With the neutral from the energized side coming down. Darin Harrington Well, the ground, it's not a neutral, it's a ground, but it's connected to something else, but it comes down the side inside the box. Unrelated to his task. Justice Breyer It was attached to the ground bar, right? Darin Harrington Yes, which is why you don't move the ground bar. You just attach the neutral to it and go about your business. And he admitted all he had to do, because what he did is he took the three phase wires and he connected them first, and then he couldn't get to the ground bar behind it. So instead of detaching one of these three phase wires, bringing the neutral up, screwing it in place, he did something he had never done before. Nobody anticipated he would do. He actually dismounted the ground bar from its location. Justice Breyer But all OSHA said was for this particular box and this particular scope of work, you should have de-energized the line side. And there's no evidence, as I read the opinions, there's no evidence that that was, you know, you wouldn't do that in an emergency room, obviously. You wouldn't de-energize an emergency room because the patients are relying on it. That wasn't the situation here. It was just inconvenient or something that was overlooked. Darin Harrington More to the point, Your Honor, it was unnecessary. You can perform this test safely. Justice Breyer Well, tell that to Mr. Skye. Darin Harrington Well, he would agree with me, and he did at trial. He agreed. He said, I did not need to do that. I should not have done that. Everybody agreed it was outside the scope of his work. He should not have done that. He should have just attached the neutral to the ground bar. This would be the equivalent. Justice Breyer Where are you getting your definition of scope of the work? Darin Harrington From what the standard says. Justice Breyer Is it documentary or is this accumulated testimony? Darin Harrington It's in the job safety analysis. The JSA, they perform before each test. The supervisor takes the employee out. They look at the test. They talk about each step, which did not involve moving the ground bar anywhere. Justice Breyer So what's the record site for when I want to – the record site for what you just – Darin Harrington For the job safety analysis? Oh, gosh. Okay. I know it's referenced in our brief. Let's see. I think – Your Honor, I'm going to have to get that. Justice Breyer Well, I'm sure we can. It's a document created when? Darin Harrington It is – looks like it is Exhibit Appendix 0045. Complainants Exhibit C23. Justice Breyer I remember that. So when was it created? Darin Harrington Prior to the task. Justice Breyer How much prior? Darin Harrington Immediately. You have to do it right before. They do this all day, every day. Justice Breyer Okay. Darin Harrington So you have to walk up. You walk out the job. Justice Breyer I would hope so, yes. Darin Harrington Yeah, and you go through each task. Moving the ground bar is not part of it. This would be the analogy, Your Honor, if I may. If you asked me, or say maybe one of your clerks, one of your employees, to plug in your cell phone so it could charge, you may not assess many hazards with that task. All the employee has to do is take the phone over, plug it into the outlet. But if the employee decides, well, there's something in the way, so I'm going to take the outlet box out of the wall, disconnect it from whatever's around it, bring it over to your phone, plug it in, and now I'm going to take everything back and reattach the outlet box, under OSHA's analysis, under the ALJ's interpretation, that's a possibility. And merely because it's a possibility, you could be cited as the employer. That's not how OSHA law has ever been interpreted. The employee's actions have to be reasonably predictable. It's not just what's possible. It has to be what is reasonably predictable. There aren't any circuit cases cited here. Well, the standard review commission is Rockwell and Fabricated Metal, and they both make it very clear that the standard's not just because it was merely possible to go around a guard. It has to be reasonably predictable. And there's no other way for these standards to be applied on a daily basis in the real world if there's not some limiting principle. And the judge in this case removes all the limiting principles when he decides that exposure existed simply because it was possible that the employee might somehow circumvent the arc shield at the top of the box that was attached to equipment he had no responsibility for working on. And the employee himself, who was no longer employed by Jacobs at the time of the trial, agreed that what he did was outside the scope of his work. It wasn't work he was assigned to perform, and therefore there were no hazards associated that Jacobs assessed for purposes of protective equipment. These individuals have to every day go through this analysis, and if this court decides that the employer is responsible for anything that's remotely possible, then we've basically gutted the value of the standard. Did you cite cases on this reasonably predictable? You cited something that I... Yes, Your Honor. It's developed... Say that again. I'm looking at your table. Yeah, it's... They're famous cases in ocean jurisprudence. It's fabricated. Metal and Rockwell, those are the two cases that get cited over and over when it comes to guarding. Oh, there it is. Okay, but... All right. Those are ocean's decisions. Yeah, the review... Did you discuss our Valdek case? I'm sorry? 96 Valdek court case involving employee misconduct or an employee who's, as you say, responsible for the accident. I'm not familiar with the specific case by name, but the misconduct in this case, and the employee acknowledged this, and he was a former employee at the time when he testified. He's obligated to stay within the scope of his work, and he testified he didn't do that here. And then if he has any questions or concern or thinks he may have to do something different, like moving a ground bar, he's obligated to stop work, consult with the supervisor, reassess the hazards. The employee had a good track record of doing that. These are things that happen on a daily basis, and he had reliably done that in the past. He admitted he should have done it in this case, but didn't. Your Honor, I have a little bit of time left. I'd like to reserve that for rebuttal. Thank you, Mr. Harrington. Thank you, Your Honor. Ms. Tyron? Tryon? Good morning. May it please the court, my name is Amy Tryon. I represent the Secretary of Labor. I'd like to start by addressing Jacobs' argument about Mr. Skye exceeding the scope of his assigned work. First of all, their brief contains mischaracterizations of the hearing testimony, most significantly as to Mr. Skye and the OSHA compliance officer. I sound so loud to myself, I'm sorry. The brief contains mischaracterizations of the hearing testimony, most significantly with respect to Mr. Skye and the OSHA compliance officer. What Mr. Skye essentially said in his testimony was that he made a mistake, in the obvious sense that he unintentionally caused this arc flash that seriously burned him. That's not the same thing as an admission that he acted outside the scope of the assignment he was given, and in fact, the evidence shows the opposite. Mr. Skye was assigned to do three things, run conduit, pull wire, and terminate wire in the bottom half of the box. That's the extent of the specifics he was given. He was never directed not to move the ground bar while doing those tasks, nor was he told to do or not to do any of the many things that one presumably does while accomplishing those larger tasks. The instructions were general ones, and Mr. Skye testified that he had to move the ground bar in order to accomplish the task of terminating wire because the room inside the box was so limited. Jacobs' position is essentially equivalent to saying that it exceeds the scope of your assignment to make a mistake that causes an accident. That impermissibly shifts the burden of complying with the OSH Act to the employee. And in any event, the ALJ found, and substantial evidence supports, that even if the arc flash had never occurred, even if Mr. Skye had not moved the ground bar, he was still exposed to the hazard of arc flash burns because of the risk of inadvertent contact, either from a finger or tool flipping through one of the gaps around the arc shield, or a wire moving in an unexpected way and contacting live wires through the gaps. And that's, in fact, what happened here. So the gaps around the arc shield were three inches. That's an argument they have to de-energize the top half of a dispatch box every time they do this kind of work. Or provide the employee with appropriate personal protective equipment. Mr. Skye was wearing the arc-rated gear, the gloves and shield and so on, when he began the task until he de-energized the bottom of the box. If he had left that on while he finished his task, Jacobs would have complied with the standard. And was it a policy of Jacobs or an instruction of the direction of his supervisor that once he de-energized the load side, he could take the mask and gloves off? It was their policy and practice that when working on a different piece of equipment called an MCC bucket, which also has a line side and a load side, that once the loads... I'm afraid I have my sides mixed up. Once the bottom side, the outgoing side was de-energized, it was okay to work on the top side without PPE. And the foreman testified that he assumed that that MCC bucket policy applied to this disconnect box also. The secretary's expert witness explained why those two pieces of equipment are different. And the expert witness also identified the... I'm leading on to something here. So the foreman assumed the policy was applicable? Correct. The foreman then told Skye? Or how did... What was the employer authorization to Skye, if any, to decide that it was okay to take his mask and gloves off? I don't think the record reveals if the foreman said something specifically to Mr. Skye, but the foreman testified that he knew Mr. Skye would remove his personal protective equipment, and Mr. Skye testified that he took it off because, as far as he knew, there was no hazard. The job safety analysis had not revealed any hazard, and he just... That was how he understood that the job was to be done. Well, now the insurer argument that Jacobs makes starts looking a little better. I thought the only reason that this employee mistake turns into employer liability was that he was following a policy that was unsafe in the circumstances. That's correct, Your Honor. If he's just an employee doing a job wrong, why doesn't the employee cause risk defense, and why? I don't think that the record shows he did do the job wrong. You're saying that... No, but you're saying... You're arguing what they said that the commission decided, that the standard only implies the employer to provide PPE, not ensure that the PPE is worn. Oh, no, Your Honor. I'm sorry if I was unclear. It's absolutely the employer's obligation to ensure the PPE is worn. So that means that there has to be a supervisor standing next to every employee wearing this equipment 24-7. That's not true, Your Honor. How can you comply otherwise? Well, Jacobs raised the affirmative defense of unpreventable employee misconduct. I'll stick with my concern here. Well, I think this answers Your Honor's question, because there is a defense, a recognized defense in commission case law for unpreventable employee misconduct when the employer does everything it can within reason, and the employee still breaks the rule. But there are elements to that. The ALJ rejected that defense here, and there are elements to that affirmative defense. Essentially, what the employer has to show is that it had a work rule that implemented the cited standard, and that it enforced that rule adequately, such that there was nothing more that they could have done to prevent an employee from breaking the rule. But here they didn't. Wait, wait, wait. Why isn't that this case? Because here they didn't. Jacobs didn't have a work rule saying. I mean, if Jacobs had a work rule saying you have to wear. He had the stuff on. He had the stuff on. That was a work rule, right? He had the stuff on until he de-energized the bottom half of the box. And then he chose to take it off. No, he took it off pursuant to Jacobs' policy and practice. And then you couldn't give me chapter and verse on how he knew it was policy and practice. Well, he works for this company. The job safety analysis said there's no hazard here. The job safety analysis said the hazard exists in the bottom half of the box. And once that part has been de-energized, that's all you have to do. Does that job safety analysis say then you can take your gear off? Your PPE off? I don't recall what the job. I don't think the job safety analysis says anything about PPE, but I don't have it memorized. But. You know, I don't know that an employee working around a half-energized dispatch box rewiring it is going to know anything. But this is, you know, keep your protective gear on. Unless the employer affirmatively says something. Well, he took it off for some reason. It made the job easier at the moment. Well, but the knowledge of. . . Jacobs doesn't dispute that they knew he was going to remove his PPE. The foreman testified, I knew he was going to take it off after he de-energized the bottom half of the box. Can I come at it from a different angle? Please do, Your Honor. The regulation itself is not very specific. It doesn't have a lot of details, you know, about do this, don't do this. Isn't the regulation necessarily informed by industry custom and practice? Yes, Your Honor. So for general OSHA standards like this one, what the Secretary has to prove is that a reasonably prudent employer would have understood that there was a hazard and provided protection. Okay, but is there any evidence that taking off the PPE after the one side has been de-energized isn't custom and practice in the industry? Well, custom and practice. . . But several testified that that was the custom and practice in the industry, right? There was testimony that some other, some to many other employers work on these boxes that only have to be energized. I have two responses to Your Honor's question. One is that the commission . . . Is there any evidence that says that that's not industry custom and practice? Well, the Secretary's expert addressed this. And I would like to just interject that the commission has held that there are three types of evidence that the Secretary can use to establish this reasonably prudent employer, what that person, what that employer would have done. Not only industry custom and practice, but also published industry consensus standards and testimony from expert witnesses familiar with the type of hazards and equipment at issue. And both of those other two types of evidence, the industry consensus standard and the expert testimony, support the notion that this was unsafe. Now the Secretary's expert witness . . . Support the notion what? That this was unsafe, that it was unsafe to work on the, that it was hazardous, that he was exposed to a hazard and should have been wearing protective gear. So the Secretary's . . . On the dispatch box. Now we're not talking about the other buckets. Right. On the dispatch box that had these gaps and the wire running down as previously discussed, which the expert identified as the conditions constituting the hazard. What's the site to an industry standard? There's an industry . . . the industry standard is from the National Fire Protection Association. It's NFPA 70E. And it says . . . It says that . . . It says that if employees are working on circuit controls with exposed voltage of 120 volts or greater, that they need to be wearing personal protective equipment. And the voltage here was 480 volts. And so the ALJ relied on that . . . relied on that industry publication also. And I think the larger . . . Wait a minute, that says exposure. What you just read, this was a non-exposure environment once it's de-energized. I'm sorry, I don't understand. The top of the box was energized the entire time that Mr. Skye was working on it. Yeah. But the understanding, and apparently in maybe industry practices, once you . . . If you're dealing with a de-energized piece of equipment, you're working on it where you're working. Well, I think the argument is that the . . . that it's in . . . not that it's de-energized because it's not. The top is still energized. But that it's in what's called electrically safe working condition. And there was evidence that other . . . some other employers in the industry considered that set up to be an electrically safe working condition. But I have two responses to the argument that they should be able to . . . that that gets them off the hook. And the first response is, just because other people are doing it, doesn't make it safe. Here we have the industry publication, industry standards saying it's not safe, and the expert witnessing it's not safe. Yes, people do it, but that doesn't mean it's safe. So, who testified that this wasn't common practice? That it wasn't common practice? No, I think people . . . the testimony was that it is common practice. Because you admit that you can't . . . it's not . . . the OSHA doesn't . . . isn't designed to eliminate every possible risk, right? Of course. We'd have people in bubble outfits, and we can't do that. Of course. So, if it's common industry practice to operate without PPE once one side's been de-energized . . . The answer to that is that . . . is that ALJ was careful to limit his findings to this specific box. The conditions inside this specific box that created a hazard, which were the previously noted gaps of three inches, two inches, and a quarter inch. And three inches is not that big a gap. I mean, it's a pretty big gap when you're only working eight inches away from the live parts. And then there was this wire coming down. So, Mr. Skye didn't go into the top half of the box. He was manipulating pieces at the bottom of the box. One of which was attached to that uninsulated wire that came down. That wire moved in an unexpected way. And that's . . . that's what caused the arc flash. I would also like to address quickly the purpose of the arc shield. It's called a shield and sounds like it's something designed to protect an employee. But, that's only a secondary purpose of the arc shield. The primary purpose, and ALJ discussed this on page 11 of his opinion, is to extinguish . . . I'm not an electrician, but apparently there are . . . When you have a 480 volt switch, there are normally occurring . . . There are arcs that are . . . electric arcs occur near constantly as a normal part of the operation. And, the arc shield is intended primarily to extinguish those arcs and prevent them from damaging the equipment. It's to protect the equipment, not to protect the employees. And, the Secretary's expert provided an example. A 240 volt switch, this one here was 480. A 240 volt switch doesn't arc constantly like that. And so, those switches don't have arc shields. Even though, the potential for accidentally coming into contact with the live wires is the same. So, the arc shield is not . . . it's not an employee protection device. And . . . To your knowledge, has the Supreme Court ever addressed the proposition that just because everybody's doing it . . . doesn't mean HOSHA can't treat it as an unsafe practice or standard? The Supreme Court? Yes. Not to my knowledge. But . . . Have we? Not to my knowledge. There's a First Circuit case that the ALJ cites. I can't remember the name off the top of my head. But, it's in the ALJ's opinion citing it. That . . . that . . . Well, of course, industry . . . what others in the industry do is . . . is informative. If . . . if the industry . . . I mean, OSHA . . . the OSHA Act was meant to impel changes in industry. And, if . . . if everyone in the industry is doing something that isn't safe . . . And, the standard requires . . . more . . . requires that . . . If nobody's being reasonably prudent or 10% of people . . . of employers are being reasonably prudent or 20% . . . That's still, you know, by far, an industry standard the other way. But, the . . . and that's why the Commission allows for consideration of these other types of evidence, as well. You know, that . . . that answer weakens over time. When OSHA has been around for 30 or 40 years . . . And, the employers of the . . . and the industries of the world are used to the safety compliance required. Now, the fact that everybody's doing it . . . And, a case of first impression gets . . . gets hammered by the agency, becomes more suspect. I'm suggesting . . . I mean, and that's probably true to some extent. But, on the other hand, OSHA has limited resources and doesn't get out there and find every violation. And, doesn't have the opportunity to stop by every workplace and say, you know, what you're doing looks good. It relies on industry-wide compliance. I mean, it certainly does its best to encourage . . . Well, I think it's fair to say that OSHA relies on industry self-policing, to some extent. Which is why industry publications, like the NFPA document here, are helpful. The NFPA document is . . . that's an industry self-regulating itself and saying, here's what you need to do to be safe. And, even if 40% or whatever of the employees don't abide by that . . . That's still something that the industry itself has decided is a safe practice. Thank you very much. Thank you, Mr. Troy. Mr. Harrington? Your Honors, I've got just two or three comments. One, Your Honor, I think one reason there might be some confusion about the facts . . . is that the citation itself is factually wrong. And, the compliance officer admitted that the allegation in the citation itself is wrong. The ground wire that made contact with the energized equipment behind the arc shield was not the ground wire the employee was tasked with terminating. And, I got that from the brief. But, that was never fixed. It was never amended. So, as we stand here today, there is not sufficient evidence to support the allegation in the citation. But, this isn't a trial. I mean, you know, fleeting problems tend to get resolved. I would argue they should have been, but that's the Secretary's obligation, not ours. Secondly . . . They don't have to amend their pleadings after the case has been submitted for decision on a fact record. Well, as we sit here, this citation is . . . there's no evidence to support the allegation in the citation. It's in the record today, unamended. You didn't argue that. And, I don't think you'd ever find a case that would make that reversible error. Well, we argued it at the time. We argued it in our appeal. But, Your Honor, let me . . . before I run out of time. The arc shield is advertised by GE as guarding against accidental contact. So, the Secretary is completely wrong when she says it's not the purpose of the arc shield. It's literally in their experts' witnesses' materials. It was raised at the trial, and it's cited in the brief. Finally, the NFPA 70E does apply to this case. And, this employee in this work complies with the terms of the NFPA 70E. On cross-examination, the Secretary's expert admitted that a qualified employee is allowed to work within the limited approach distance of energized equipment. And, that's what he did here. He's qualified. The only way the Secretary could get around the NFPA was to have their expert testify that while the employee and his supervision were all qualified, licensed, one for 18 years, one for 30 years, he decided, in his opinion, they weren't qualified for this task because they allowed the employee to remove his PPE once the box had been verified, the load side had been verified as de-energized. But, there's no evidence that would lead a reasonable person to conclude that Timothy Skye was not a qualified electrician. And, as a qualified electrician under the NFPA 70E, he's allowed to work within that distance of energized equipment. Thank you, Mr. Harrington. Thank you, Your Honor. Thank you also, Ms. Tryon. The Court appreciates the argument you provided to us this morning. We'll wrestle with the issues as best we can. Thank you.